23625

Lotheil TATE, Petitioner v. STATE of South Carolina, Respondent.

(417 S.E. (2d) 553)

Supreme Court

*Assistant Appellate Defender Joseph L. Savitz, III of South Carolina Office of Appellate Defense, Columbia, for petitioner.*

*Attorney Gen. T. Travis Medlock, Chief Deputy Atty. Gen. Donald J. Zelenka, and Asst. Atty. Gen. Lisa G. Jefferson, Columbia, for respondent.*

Heard Jan. 7, 1992.

Decided April 13, 1992.

## ON WRIT OF CERTIORARI

CHANDLER, Justice:

We granted rehearing to reconsider our opinion in *Tate v. State,* Op. No. 23589 (filed March 2, 1992, Davis Adv. Sh. #6). Opinion Number 23589 is vacated, and the following substituted in its place.

We granted certiorari to review denial of Petitioner Lothell Tate's (Tate) application for Post-Conviction Relief (PCR).

We affirm.

## FACTS

Tate was convicted of the murder of her brother, Malcolm. We recite, briefly, the facts leading to his death.

Since approximately age nineteen,[1] Malcolm had a history of schizophrenia. In 1984, he was hospitalized in Baltimore for approximately one year. At that time, Malcolm believed he heard voices from God telling him that Tate's then two-year-old daughter, N'Zinga, had the devil in her and that God had sent him to kill her.

After the Baltimore hospitalization, Malcolm's condition improved but began to regress $1\frac{1}{2}$ years to 2 years later when he quit taking his medications. He was repeatedly arrested for minor offenses such as trespassing and injury to property. He was treated periodically at numerous mental institutions, the treatment generally being for a few days only, followed by out-patient care.

According to his family, Malcolm's behavior progressively deteriorated, and he became more violent and abusive. However, neither Tate nor any other family member could point to a single act of physical violence by Malcolm toward them or anyone else.

Following his arrest in December, 1988, Malcolm was released on bond provided by Tate and their mother, Pauline Wilkerson. When he expressed the desire to "go somewhere," Tate and Wilkerson volunteered to take him to Baltimore where he had previously lived. Malcolm followed their instructions to return to their home at 11:00 p.m., at which time the three left Wilkerson's Gastonia, North Carolina, home.

Rather than taking a north-bound route toward Baltimore, they drove south into Chester County, South Carolina, stopping en route to purchase candy and a soda for Malcolm.

When Malcolm indicated the need to use the bathroom, Wilkerson pulled her car to the side of the road and stopped. As Malcolm walked away, with his back to Tate and Wilkerson, Tate shot him thirteen times with a .25 caliber pistol which Wilkerson had purchased a few days earlier. Tate and Wilkerson then rolled Malcolm's body down an embankment, covering it with leaves. Tate tossed the gun out of the car window as she and her mother crossed a bridge.

---

[1] At the time of his death in 1988, Malcolm was thirty-four years old.

When papers found on Malcolm's body led police to Gastonia, Tate admitted to the shooting, stating, "I felt like I did this to help the entire family out. We were all tired of the way Malcolm was doing. I did this for the family." At trial, she testified, "I was scared that one day Malcolm was going to lose his mind and harm me and my daughter and I just didn't know what else to do . . ."

Following her conviction for murder, Tate filed for PCR. She alleged ineffective assistance of counsel in failing to present psychological experts who would testify that Malcolm was dangerous, and that Tate's behavior was consistent with self-defense. Her PCR application was denied.

## ISSUE

The sole issue is whether trial counsel was ineffective in failing to present expert witnesses to testify that Tate's behavior was consistent with a claim of self-defense, and defense of others.

## DISCUSSION

Tate relies upon self-defense which, to sustain, requires that she establish (1) that she was without fault in bringing on the difficulty; (2) that she actually believed she was in *imminent danger* of losing her life or sustaining serious bodily injury, or she actually was in such imminent danger; (3) that a reasonable person would have entertained the same belief or, if the defendant actually was in imminent danger, the circumstances were such as would warrant a man of ordinary prudence to strike the fatal blow to save himself from serious bodily injury, and (4) that she had no other means of avoiding the danger. *State v. Davis*, 282 S.C. 45, 317 S.E. (2d) 452 (1984).

Where a defendant's own testimony establishes the inapplicability of a defense, failure of counsel to secure expert testimony regarding that defense does not constitute ineffective assistance. *See Pauling v. State*, 276 S.C. 92, 275 S.E. (2d) 881 (1981).

Here, it is doubtful that the record contains evidence to support *any* of the four elements of self-defense; it is certain, however, that there is no evidence Tate be-

lieved she was in "imminent danger"[2] within the plain meaning of that term as set forth in the case law of South Carolina.

Tate further contends that expert testimony would have established that Malcolm's schizophrenic condition rendered him dangerous and that, therefore, Tate was in *actual, imminent* danger. We reject this contention. Clearly, Tate was not in any *imminent* danger when she shot Malcolm in the back thirteen times as he relieved himself. Regardless of his potential for violence, the record is devoid of evidence that Malcolm posed an imminent threat to Tate at the moment of his death.

Accordingly, counsel was not ineffective and PCR was properly denied.

Affirmed.

HARWELL, C.J., and FINNEY, TOAL and MOORE, JJ., concur.

---

[2] Tate's reliance upon our opinion in *State v. Hill*, 287 S.C. 398, 339 S.E. (2d) 121 (1986) is misplaced. There, we held expert testimony regarding "battered woman's syndrome" relevant to the defendant's state of mind, and whether she acted in self-defense. In *Hill*, however, the victim had repeatedly physically abused the defendant and, at the time he was shot, was threatening to kill her. Under those facts, such testimony would be relevant to a determination whether the defendant "reasonably believed herself in imminent danger." No such facts are presented here.